Mr. Justice McLEAN.
I dissent from the opinion of the court. No point is made in this case which was not elaborately discussed and substantially ruled in the same case, reported in 2 Howard, 711. . It is true, the structure of the bill, and the liability of the government to the damages claimed, not being points made in the former bill of exceptions, were not authoritatively adjudged. But these points were so connected' with the construction of the Maryland statute, the question then before the court, that neither the counsel nor. the court could escape their consideration. No other instrument than a foreign.bill of exchange is embraced.by the statute,, and. if the government be not liable to damages on a .protested bill, no decision could have been given against it.
The points were as fully and as ably- argued then, as they have been at the present term. The addition of one learned counsel at the bar is the only change in the advocates. But the changes on the bench show the uncertainty of life, and the emptiness of human hopes. Two judges, distinguished for their great learning and ability, who participated in the former judgment, have gone to their account; ill health causes the absence, of another, and the opinions of the’ two now present remain unchanged. We submit, as-we are bound to do, to the views of our four learned associates who now decide this case.
It is insisted that the bank did not purchase the bill of exchange from' the government, but acted as its agent, using the bill as an instrument through which to perform its agency.
By the fifteenth section of its charter the bank, when required by the Secretary of the Treasury, was bound ii to give the necessary facilities for transferring the public funds from place to place within the United States or Territories, without charge.” But this duty was limited to transfers within the Union, and lid not extend to foreign countries,
The. correspondence between the. Secretary of the Treasury and the president of the bank, in relation to. this bill, shows a purchase of it by the bank. In his first letter to the bank, dated the 31st of October, 1832, the Secretary of the Treasury states the amount due under the French treaty ; that it was made his duty to have the amount transferred to the United States, and the views of Mr. Biddle as -to -the mode of transfer were solicited. In his answer Mr. Biddle says, — ,t£ The- simplest form would be the sale of a bill on Pari$-? drawn by the Secretary of the Treasury” ; that u the bank has already in Paris a larger sum than it has any immediate use for, yet-it is not indisposed to increase it, because it may hereafter have occasion for the fund, and because it is believed that, if *402 the terms can be made acceptable, the purchase of the whole by the bank would be the best operation for. the government.” The rates of exchange are then stated, and a proposition to purchase the bill at a certain per cent.
On.the 26th of January ensuing, the Secretary says he is ready to draw the bill, and adds, — “I presume the bank is still disposed to purchase, and on the terms offered in your letter of the 5th of November.” And.also he says, — “ It is desirable that the 'credit be given to the treasurer by the bank, on receiving the bill.”
To this letter Mr. Biddle replies, that the rate of exchange has declined between England and France, and that the bank could not take the bill on the terms at first proposed. On the 6th of February the new .terms were accepted, and on the following day the bill, was transmitted, and its proceeds were placed on the books of the bank to the credit of the government. '*
These facts show a proposal to sell the bill by the Secretary, and an agreement to purchase it by the bank at a certain per cent.; that the bill was drawn and forwarded to- the bank, and that for the amount of it a credit was entered to the government. In the face of these statements, which show a purchase of the bill beyond all doubt, it is extraordinary that the fact should be controverted.
It is contended that the bill, “under the circumstances stated in the record, is not a bill of exchange, and is not embraced by the Maryland statute of 1785.”'
The Secretary of the Treasury proposed to sell a bill of exchange to the bankj and the bank agreed to purchase a' bill. On its face it is called a bill of exchange, and it was negotiated as such by the bank-to Baring, Brothers, &Co., of London, atid by them to N. M. Rothschild, who indorsed it to Messieurs D. Rothschild, Brothers, of Paris. When the bill became due, a demand of payment was made on the drawee, and a protest" for non-payment, which was followed by due notice tothe drawer. The government.paid the cost of protest ánd other expenses to the bank, and also the commissions charged by Hottinguer & Co., who took up the bill, supra protest, as the agents of .the bank ; but the fifteen per cent, damages given by the Maryland statute were refused. And in a letter to the Secretary of the Treasury, the Attorney-General says, — “I have carefully examined the claims presented by the Bank of the United States, on account of the protest of the bill of exchange drawn by you on the French government,” &c. “ The account,” he says, “stated by the bank, if supported by proper vouchers, appears to be correct, with the exception of the claim of fifteen per cent, damages on the ■amount of the bill.”
But now it seems that these eminent civilians and bankers were ignorant of the legal import of this instrument,.— men who had been all their lives conversant with bills of exchange, and who had used them in their moneyed operations annually, to an amount equal to, if *403 not greater than, the revenue of this government. Yet these men, the richest and most experienced hankers in the’world,-were mistaken in calling and' treating: this piperas a bill of exchange. . Arid the government, too, were reprehensible for paying the costs of protest, for such costs could be charged only on a bill of exchange.
. Against all this knowledge, experience, and action, it is now contended that the paper is a mere assignment, or any thing else thap a bill of exchange.' That designation is repudiated, not the less zealr. ously for having been the result of second thought.
But what are the new lights shed upon this question ?
Two documents are found in the present record, which were not before the court at the former argument; and these, it is said, have a material bearing on the case. The first is a letter dated 8th February, 1833, from the Secretary of State to Mr. Niles, our charge 'd’affaires at Paris, informing.him that a bill had'been drawn on the French government for the first instalment and interest under the treaty, in favor of Samuel Jaudon, cashier of the Bank of the United States, and requesting that notice should be given of the arrangement to the French government.
This is nothing more than a letter of advice,-which usually precedes a bill of exchange, of which the payee in this instance had no knowledge. It, however, conduces to show the nature of the transaction, as not only the substance of a bill of exchange was regarded, but also its form and accompaniment.
The other document was under the seal of the Uhited States, and signed by the President and Secretary of State. It.stated the substance of the treaty ; the act of Congress authorizing the Secretary of the Treasury to have the instalments, .as they became due, transferred to- the United States ; and that the Secretary had drawn a “ bill on the Minister and Secretary of State for the‘Department of Finance of the French government, payable at sight, for four millions eight hundred.and fifty-six thousand six hundred and sixty-six francs and sixty-six centimes, being the amount of the first.instalment, payable to the United States, under the said convention, on the second of the present month of February, and' of the interest which is payable at the same time ; which bill is payable to Samuel Jaudon,” &c., and the President ratifies the act of drawing the bill, and the receipt which shall be given, &c.
Now this paper is supposed to take away from the bill of exchange its character as a commercial instrument. It can have no other effect than to show that the Secretary had authority to draw the bill. It was no part of the bill of exchange, and indeed was not necessary-ip its negotiability. The indorsement.'of Jaudon implied an undertaking that he was the cashier of the bank, and that the bill was genuine and would be paid. No one can doubt that the payment of the money by the French government on the bill, without any additional evidence, would have been good. The bill upon its face *404 was perfect, and authorized the holder to receive and receipt for the money.
At most, the document can only be considered as authenticating the law under which the Secretary acted in drawing the bill. And this was all that the French government, under any circumstances, could require. But suppose this paper was a power of attorney, signed by the President, authorizing the Secretary to draw the bill; would that change or in any way affect its commercial character ?
Any person may draw, accept, or indorse a bill by his. agent. A partner may indorse for the firm. And this authority may be by parol or writing not under seal. So a corporation may draw by its agent. Banks are in the constant practice of drawing bills through their cashiers. And has it ever been supposed, that, if evidence accompanied or was attached to the bill of the'authority of the drawer, it impaired its commercial properties ? Mr. Chitty says, in his Treatise on Bills (p. 27), — “ Where a bill is not signed by the party himself, the party taking it must first satisfy himself that the agent had power so to act for the supposed principal.” In the case of the East India -Company»;. Tritton, 3 Barn. & Cres. 280, three bills upon the East India Company were payable to Hope or order ; they got into possession of Card, who indorsed them for Hope. Card had a power of attorney from Hope, but it was not sufficient to warrant these indorsements. This power being seen by the holders of the bill, they were bound by it, as having notice of its extent.
But a bill,drawn by an agent, under a power, was never supposed to be less a bill than if it had been drawn by the principal. And in such cases the assignee has only to satisfy himself that the drawer acted under a proper authority. This no more vitiates the bill, than evidence of the genuineness of the signature of the drawer. The bill in question was complete upon its face, and it is inconceivable to me how the paper signed by the President can affect it.
In the argument it is supposed that, in drawing this bill, the government acted in its sovereign capacity. The idea of attaching sovereignty to all the agencies of the government, however exercised, is as novel as it is unconstitutional. Cover every transaction of the agents of the government by the attributes of its sovereignty, and a despotism, characterized ,by the grossest acts of injustice and oppression must result.
A bill of exchange derives all its properties from the commercial law. It is ■ a most convenient- instrument for the transfer of funds from one-country to another. And its chief and only value, in this ^respect, arises from the legal principles with which it is invested, and which regulate the duties and liabilities of those who become parties to it. In negotiating' such an instrument, the government does, not act in its sovereign capacity. It becomes, subject, like all "other parties to the bill, to the commercial principles which' govern it. - '
*405 In the case of the United States v. Administratrix of Barker, 12 Wheat. 559, it was held, that “ whenever thé government of the' United States, through its lawfully authorized agents, becomes the holder of a bill of exchange, it is bound to use the same diligence in order to charge the indorser as in a transaction between individuals.” And in that case the indorser was held to be-discharged by the negligence of the government. And again, in the United States v. Bank of the Metropolis, 15 Peters, 392, the court say, — ‘ ‘ When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibility of individuals who are parties to such instruments. We know of no difference except that the United States cannot be'sued.”
These decisions, and many others that might be referred to, put an "end to the assumption, that a bill of exchange drawn by the government is an act of soveréignty, or any thing different in principle from .a bill drawn by an individual. Whether drawn by the government or an individual, a bill of exchange is the same commercial instrument, and subject to the same law. No principle is better settled than this by the decisions of this court.
But it is supposed that there is something in the character of the drawee, the French government, which destroys the - comm,t^ial character of the bill. This position is as unsustainable as th&Fof the character assumed for the drawer. The bill was drawn on M.' Humann, the Minister of Finance of the French government. The money was due, and the payment of it was subject to no contingency from the face of the bill, nor from any circumstance connected with it. ' The drawer guaranteed the payment of the bill on presentation by the holder, under all the responsibilities which the law attached. A demand, protest, and notice were the only conditions on which these responsibilities were to become fixed.'. These conditions have been performed by the bank, and the government has acknowledged its liability by paying, a part of the damages claimed. But throwing itself upon its sovereignty, the government refuses to pay the damages claimed under the statute of Maryland, on the ground that the instrument is not a bill of exchange. If this ground be true, the costs of protest should not have been paid by it.
It is contended, that, as the question is now here, between the original parties to the bill, the bank may be supposed to have taken the bill under a full knowledge that it might not be paid by the French government; and could not be paid by it, unless the Chambers should make an appropriation. And from this knowledge it is inferred, that the bank took upon itself the risk of the punctual payment of the bill. This assumption is shown to be unfounded by the fact, that the government, on being notified of the protest, immediately returned the money to the bank which it had paid on account of the bill. Now if there had been any.'understanding, express or implied, such as is presumed, in regard to the punctual payment of *406 the bill, would the government.have done this ? There can be but one answer to this question.
There was no doubt in the- minds of the original parties to this bill, that it would be paid on presentation. What was the language of this government on receiving notice of the protest ? • Was the failure of the French Chambers to make the appropriation received as an apology for the dishonor of the bill ? That government was informed, in terms not to be misunderstood, that no excuse for a delay of payment could be received. That the obligation of the French government was absolute, and in no degree dependent on •the will of the Chambers ; and an immediate payment was required. The bank,' shortly after the receipt of this bill, indorsed it to Baring, Brothers, & Co., in London. This affords the highest evidence that the bank believed the bill would be honored.
It is argued that the French government did not.subject itself to a bill of exchange, and consequently to the payment of damages on a default of payment. This may be admitted, and yet it does not reach the question. The bill was not presented until the money was due, and by drawing it our own government undertook that it should be paid. This is as well settled as any other principle in the commercial law. . .,
It seems to be considered that the case might" have been stronger against the government, had it been made by an indorsee of the bill, This 'cannot be correct.. Every indorsee, from the face of the bill, had all the notice which can be charged against the bank. *
But it is contended that the bill was drawn on a particular fund, and therefore was not a bill of exchange.
' It is admitted, ij: the payment of the bill is made to depend upon any contingency, it is not a bill of exchange. In the language of Mr. Chitty, — “ If the payment is to depend on the sufficiency of a particular fund, the bill or note will be invalid.” The case of Jenny v. Herle, 2 Lord Raym. 1361, was much relied on in the argument. Herle sued Jenny upon a bill drawn by him upon Pratt, and payable to Herle, as follows : — ‘ Sir, you are to pay Mr. Herle ¿61945 out of the money in your hands belonging to the proprietors of the Devonshire mines, being part of the'consideration-money for the purchase of the manor of West Buckland.’. Herle had judgment in the Common-Pleas ; but upon a writ of error, the Court of King’s Bench held that this was no bill of exchange, because it was only payable out of a particular fund, supposed to be in Pratt’s hands, and the judgment was accordingly reversed.”
The decision in that case dicj not turn upon the words on the face of the bill, “ being part of the consideration-money for the purchase of the manor of West Buckland ” ; but on these, — u You are to pay.Mr. Herle out of the money in your hands belonging to the proprietors of the Devonshire mines.” - The'former words here cited in effect are the same as those used in the French bill,.' ghow- *407 ing the consideration on which it was drawn ; but in Herle’s case these words constituted no objection to the bill, and were not referred to by the court. The case turned exclusively on the direction to “pay out of the money in your hands belonging to the proprietor's of the Devonshire mines.” Had these words been omitted, the bill would have been good. So that the case of Herle, so much relied on by the plaintiffs’ counsel, does not show the invalidity of the French bill.’
The bill in Herle’s case, in the .language of the court, was payable out of money supposed, to be in Pratt’s-hands. Consequently, it was payable out of no other fund. And if. the fund supposed to be in Pratt’s hands was not there, then the bill was not-payable. Compare this with the French bill:— “ Sir, I have the honor, to re-, qu'ést you to pay at sight of this my first of exchange, &c., to the order of Samuel Jaudon, cashier of the Bank of the United States, the .sum of four millions eight hundred and fifty-six thousand six hundred' and sixty'-six francs sixty-six centimes, which comprises the sum of 3,916,666.66 francs, constituting the amount of the first payment to be made to the United States, by virtue of the convention concluded.between the. United States and France, the 4th of July, one thousand eight hundred and thirty-one (deduction made of the amount of the first payment, reserved to France by said treaty), and the additional sum' of..nine hundred' forty thousand francs'; for a year’s interest at four per cent, upon the entire sums payable to the United S _tes, dating from the day of the-exchange of ratification to the second of February, 1833.”
Now there is not on the face of this bill any intimation out of What; fund the French government should pay it. It specifies on what account the.bill was drawn, showing the am was due ; but this does.not affect the character.-of the bill. The instalment “ was referred to,” in the language of Mr. Chitty, “ in order to show the consideration, and not to render the payment,contingent.”
In Burchell, Administrator, &c., v. Slocock, 2 Lord Raym. 1545, the action was on a promissory no.te, whereby the defendant promised to pay to A..B. £101 12s. in three months after the date of the said note, “ value received out of premises in Rosemary Lane, late in, the possession of G. H. The court, on demurrer, held .this to be .a promissory note within the statute.” And so in. Hausoullier v. Hartsinck, 7 Term, 733, the defendant promised to pay --, or bearer, £25,. being a portion of a' value as under deposited in security for the payment thereof. Upon a special'case being reserved, the court said they were clearly of opinion, that though,, as between’ the- original parties to the transaction, the payment-of the notes was to be carried to a particular account, the defendants were liable on these note?, which were made payable at all events.
The question is, whether the payment of the bill is made to de *408 pend upon any contingency. Now, it is clear this is not done in the French bill. It is made payable absolutely^ without any condition expressed or implied.
The maker of a note promised to pay A. B. eight pounds, so much being to be due from me to C. D., my landlady, at Lady-day next, who is indebted in that sum to A. B.- Was held not to be conditional. Chitty on Bills, 139. Now, in this instrument the consideration is stated; but that did not vitiate the note- The French bill states nothing more, than that the' amount drawn for was due by treaty. And -yet this is supposed to destroy its negotiable character. A decision to this effect would, in my iudgment, introduce a new principle into the law governing bills ot exchange.
Is the bank entitled, under the statute of Maryand, to the fifteen per cent, damages ?
The argument that the State of Maryland did not intend to subject her sovereignty to the provisions of the statute is entitled to but little consideration. *The interest involved does not reach the sovereignty of’the State ; and it is sufficient to say, there is no exemption of the interests of the State in the statute ; and in passing it, the legislature intended, as in the enactment, of every other law, that, all legal effect should be given to it.
The words of the statute are, “ that, upon all bills of exchange hereafter drawn in this State on any person, corporation, company, or society in any foreign country,” &c. ; and it is intimated that these words do not embrace a foreign government: In answer to this, it may be said the bill is drawn on M. Humann, and is .literally within the statute.
From the cases above cited, it is clear that the government, in drawing or negotiating a bill of exchange, subjects itself to all .the liabilities of an individual; consequently it is liable to the fifteen per cent, damages, under the Maryland statute, if the bank is entitled to them. These damages were considered by this court in the former decision as designed by the statute to cover reéxchange. This construction is opposedy.and it is argued that reexchange is provided for in the statute, where it declares that the holder of a protested bill “shall have a right to receive and recover so much current money as will purchase a good bill of exchange of the’ same time of payment, and upon the same place, at the current exchange of such bill.” And the fifteen per cent, damages in this view are considered as a penalty.
Instead of covering reexchange by the above provision, the legislature intended to give the holdqr of the protested bill the money he paid for it, varying only as thé rate of exchange should be at the time. If the rate of exchange at the protest of the bill was lower than when it was purchased, the holder, under the statute, would recover less than he paid for it; but if exchange.had risen, he would recover more. Now, this exchange is limited to this *409 country, and therefore cannot have been intended as reexchange. Réexehange is a bill drawn at the place of payment of the protested bill, which shall sell for the amount of such bill. The holder of the French bill^ on its protest, was entitled, on commercial principles, independently of the statute, to a .bill on this country which would sell at Paris for the amount, of the protested bill. This would be a very different sum from that which was paid for the bill in this country. The reexchange depends upon the state of trade between the two countries, direct and circuitous, the money market, always regulated by the demand and supply, and other circumstances of a local character,, which show that the price at which the bill was purchased in this country can never be the price at which a bill on this country would sell at Paris, or in any foreign country. This fact being known to the.legislature of Maryland, they could not have intended by the above provision to cover reéxchange. The statute gives to the purchaser of the bill the amount he paid for it, with the small variation stated, and nothing more. The fifteen per cent, damages were given in lieu of re-exchange, and not as a penalty. This is the view taken by the court in its former decision.
It is said that the bank, not having paid damages on the bill, is not entitled to them. The bank, having negotiated the bill, was responsible for its payment, with damages. And after the protest, the agents of the bank supervened, and paid the amount of it to the holder. The propriety of this payment is'" riot questioned. By this act, the bank became the holder of the bill, not as indorsee, but as. the'original- payee. In effect, this' ownership obliterated and annulled the indorsements on the. bill. The bank,, as the holder, could look to no one but the government for payment. And payment to the bank in this .country was made, shortly after notice of protest was received.
But the damages given by the statute have been withheld. Had' the bank never negotiated the bill, and madé a demand of payment, and protest for non-payment, with regular notice, the right to the damages- claimed could not have been contested. And this is the precise condition of the bank. It is the holder, having’ paid the amount of the bill at Paris.
,\The large amount of the damages claimed has been adverted to in .the argument. This should have no influence on the legal' questions that arise.
Suppose the bank had not taken up the bill after protest; is there any doubt that the holders could have recovered damages from their indorsers, and they from the bank ?' This would have subjected the bank to the payment of the damages given by the law of the place where the bill was first indorsed. But this circuitous course was prevented by the payment of. the bill. It thus appears that the*bank paid this large sum of money in Paris, unex *410 pectedly, which m' the nature ef things must have subjected it to great inconvenience and loss. By the payment, the credit of the government, as the drawer of the bill, was sustained, and the eventual liability of- the bank for principal and damages anticipated.
Now, as between individuals, this would entitle the holder of the bill to the fifteen per cent, damages. And it is equally clear and just, that the bank should receive the same1. There has been paid to it by the government. the principal, costs of protest, and the commission charged by Hottinguer & Ctr.' as the agents of the bank, who took up the bill, but not one cent has been paid to the bank for the advance of the money at-Paris. On the principles of equity, independently of the statute, the bank is entitled to the difference in value of the sum paid by it in Paris, and the sum received by it from • the government in this country. This -is re-exchange, which the fifteen per cent., in my opinion, was intended to cover. Of this opinion was the court which formerly decided this case.
I think the judgment of the Circuit Court should be affirmed.
Mr. Justice WAYNE also dissented from the .opinion of the court.
Mr. justice WOODBURY, having given an official opinion as Secretary of the Treasury against the claim of the bank in this case, did not sit.

Order.

■ This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and- was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this .court, that the judgment of the said.Circuit Court in this cause he and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to that court to award a venire fades de novo, and for further proceedings to be had therein in conformity to the opinion of this court.